## STATE OF CONNECTICUT *v.* HENRY JEMISON
### (12333)

DUPONT, C. J., and O'CONNELL and FOTI, Js.

Argued March 28—decision released June 2, 1994

*James A. Winslow,* assistant public defender, for the appellant (defendant).

1

*Marjorie Allen Dauster,* assistant state's attorney, with whom, on the brief, was *James E. Thomas,* state's attorney, for the appellee (state).

O'CONNELL, J. The defendant appeals from his conviction, after a jury trial, of escape in the first degree in violation of General Statutes § 53a-169 (a) (2).[1] The dispositive issue is whether the trial court properly instructed the jury that the defendant could be found guilty of escape in the first degree if he failed to report to his supervising parole officer.[2] We affirm the judgment of the trial court.

The jury reasonably could have found the following facts. The defendant was a convicted felon serving a sentence in the custody of the commissioner of correction. Pursuant to General Statutes (Rev. to 1991) § 18-100 (e)[3] he was transferred to a supervised home release program in August, 1991, with his assigned community residence being his mother's home at 174 Blue Hills Avenue in Hartford. The defendant's mother, Patricia Jemison, was his home release sponsor. Prior to entering the program, the defendant signed an

[1] General Statutes § 53a-169 (a) (2) provides: "A person is guilty of escape in the first degree . . . (2) if he escapes from any . . . community residence to which he was transferred pursuant to subsection (e) of section 18-100 . . . ."

[2] The defendant also argues that the commissioner of correction acted beyond his authority when he attempted to create a new escape crime by including failure to report as an escape in the conditions of release signed by the defendant. This claim is subsumed under the single issue stated above.

[3] General Statutes (Rev. to 1991) § 18-100 (e) provides in pertinent part: "If the commissioner of correction deems that the purposes of this section may . . . be more effectively carried out, he may transfer any person . . . to an approved community residence with the concurrence of the warden, superintendent or person in charge of the facility to which said person is being transferred. Any inmate so transferred shall remain under the jurisdiction of said commissioner. Any inmate transferred to an approved community residence shall also be subject to specifically prescribed supervision by personnel of the department of correction until his definite or indeterminate sentence is completed."

agreement listing twenty-one conditions of his release into the community.[4] One of the conditions required the defendant to report to his parole officer once a week. The defendant abided by this condition from the time he entered the program until May, 1992.

Due to his drug use in violation of the drug use condition, the defendant was placed in a drug treatment program from May 6 to June 4, 1992. On June 4, the defendant reported to his newly assigned parole officer, Thomas Conway, who told him that he was to report again on June 11, and that he would have a standard Thursday reporting day. The defendant failed to report on June 11 or any time thereafter, resulting in ten missed reporting days.

Conway followed department procedures in an attempt to locate the defendant and to secure his compliance with the reporting requirements. In accordance with these procedures, Conway checked the computer on the evening of June 11 to determine if the defendant was in custody due to a subsequent arrest. Finding no report of an arrest, Conway mailed a letter to the defendant instructing him to report on June 18. The

---

[4] The conditions included the following:

"(6) I realize that I am still an inmate and am responsible to conforming to the rules of the department [of correction].

"(7) I will abide by all conditions of my release. Failure can result in reincarceration and disciplinary sanctions.

"(8) I will report as directed and follow the instructions of my supervising officer. Report before 11:00 a.m. on Thursday mornings.

"(9) I agree that I am guilty of escape in the first degree if I escape from a community residence to which I was transferred pursuant to subsection (e) of section 18-100 . . . .

"(18) I will not at any time use, or have in my possession or control, any illegal drug or narcotic . . . .

"(21) I also agree to abide by the following INDIVIDUAL CONDITIONS: (A) Report to Hartford Parole Officer Sequist on Thursdays, 8:30 a.m.-11:00 a.m. or 4 p.m.–6:30 p.m. (B) Report to community services counselor Jack Towne for drug/alcohol tx once a wk for six mon. at 300 Sheldon St. Htfd. CT 566-3177."

defendant did not do so. On June 19, in a further attempt to locate the defendant, Conway telephoned and visited 174 Blue Hills Avenue, but did not find him. Upon leaving the residence, Conway left his business card with his telephone number in the door. Thereafter, on June 22, Conway received a telephone call from the defendant's mother. Although he inquired several times whether she knew how to get in touch with the defendant and where he was residing, he was unable to elicit an answer.

When the defendant failed to report on June 25, Conway ran another computer check and sent another letter to the defendant's assigned community residence. On June 30, one of the defendant's sisters, who would not give her name, responded to the letter by telephoning Conway. She did not indicate that she knew the defendant's location. Nevertheless, Conway gave her a message that the defendant must report to him on July 2. Once again, the defendant failed to report. On July 8, Conway and the defendant's drug counselor visited the defendant's assigned residence and spoke to the defendant's mother who said she had no idea where the defendant could be found.

When the defendant failed to report on July 9, Conway ran another computer check and sent a third letter to the defendant's community residence. The defendant failed to report on July 16 and 23. On July 24, Conway made another home visit and once more did not find the defendant. During these July visits, Conway was permitted to enter the house, although he never saw the defendant. Some time later, Conway again spoke to the defendant's mother, who furnished no information concerning her son's location. Conway visited the house again on August 14 and emphatically informed the defendant's mother that her son was required to report. During his August visit to the house, Conway was taken into the kitchen where

he could see into the defendant's bedroom. Although the home visits were made at varying times of the day, Conway never saw the defendant in or around the house. Following his August 14 home visit, Conway applied for a warrant for the defendant's arrest for escape.

The defendant presented evidence in support of his defense that he had continued to reside at 174 Blue Hills Avenue but had hidden from Conway because he did not want to be reincarcerated due to his drug use. The defendant's mother similarly testified that the defendant had been living at her house during the summer of 1992, but she had lied to Conway about her son's whereabouts because she feared that Conway would send him back to jail. She also testified that while living with her, the defendant had received his mail and his telephone messages, had known of Conway's visits and had been given Conway's business card.

In rebuttal, Conway testified that on each of the three home visits during which he spoke with the defendant's mother, she told him that he did not live at her house and that she had guessed various places where he might be found each time Conway asked where he was.

During its deliberations, the jury sent the following note to the court: "Is it necessary for the state to prove that the defendant was not a resident of 174 Blue Hills Avenue during the period in question? Must the state supply evidence of another residence, i.e., physically put him at another location?" In response to this question, the court gave a comprehensive supplemental charge, the essence of which was that the defendant could be found guilty if he either (1) failed to reside at the required address or (2) failed to report to his parole officer.[5]

---

[5] The pertinent part of the trial court's supplemental charge was as follows: "The information in the case alleges that the defendant committed

As now instructed, the jury had two alternatives under which it could find the defendant guilty. When one of two alternative grounds for conviction would not constitutionally support a guilty verdict, the conviction must be invalidated because a general guilty verdict makes it impossible to know whether the jury relied on the impermissible ground. *Leary* v. *United States,* 395 U.S. 6, 31–32, 89 S. Ct. 1532, 23 L. Ed. 2d 57 (1969); *State* v. *Reid,* 193 Conn. 646, 667 n.22, 480 A.2d 463 (1984); *State* v. *Marino,* 190 Conn. 639, 651, 462

---

the crime of escape in the first degree in two ways . . . first by failing to reside at 174 Blue Hills Avenue in Hartford, Connecticut, the community residence to which he had been transferred, or by failing to report to the Hartford Division Of Parole on June eleven, nineteen ninety-two [6/11/92], June eighteen, nineteen ninety-two [6/18/92], June twenty-five, nineteen ninety-two [6/25/92], July second, nineteen ninety-two [7/2/92], July nine, nineteen ninety-two [7/9/92], July sixteen, nineteen ninety-two [7/16/92], July twenty-three, nineteen ninety-two [7/23/92], July thirty, nineteen ninety-two [7/30/92], August six, nineteen ninety-two [8/6/92], and August thirteen, nineteen ninety-two [8/13/92].

"If the evidence satisfies all of you beyond a reasonable doubt, that the defendant escaped by committing any one of the two means alleged by the state, then you may find the defendant guilty of count one. If not, then your verdict would be not guilty. Your verdict, however, must be unanimous one way or the other as to the manner the crime was committed. That is all six of you must agree that the evidence does or does not establish the defendant's guilt beyond a reasonable doubt by either way of committing the offense.

\* \* \*

"So, to answer your question more specifically, to prove that the defendant violated the statute by failing to reside at 174 Blue Hills Avenue, Hartford, Connecticut, the state must prove that the defendant [failed to] reside at 174 Blue Hills Avenue, the community residence to which he had been transferred. However, to prove that the defendant escaped by failing to report on the dates specified on the information, the state does not have to prove that the defendant [ceased to] reside at 174 Blue Hills Avenue, Hartford, Connecticut."

The language contained within the brackets in the last two sentences of this supplemental instruction were not in the transcript and were apparently left out by either the trial court or the court reporter. The defendant does not, however, challenge the charge as being unclear. Thus, we will assume that the jury heard the charge as it appears above.

A.2d 1021 (1983); *State* v. *Linares,* 32 Conn. App. 656, 673, 630 A.2d 1340 (1993).

The defendant concedes that escape under the first alternative (i.e., failure to live at the assigned community residence) is well established in law. The defendant, however, challenges the constitutional validity of the second alternative (i.e., failure to report to his parole officer). Accordingly, unless the trial court's instruction on the second alternative is correct in law, we must reverse the conviction. *State* v. *Reid,* supra, 193 Conn. 667 n.22.

In support of his claim that the supplemental instruction was not correct in law, the defendant relies heavily on *State* v. *Lubus,* 216 Conn. 402, 581 A.2d 1045 (1990). The *Lubus* court held that proof of a defendant's *single* failure to report to a supervisor was insufficient to convict a defendant of escape because a *single* failure to report could not be construed as an unauthorized departure or failure to return. Id., 410.

*Lubus* is distinguishable from the present case. *Lubus* involved only one failure to report and the record in that case was silent as to any contacts or attempted contacts between the defendant and his supervisor and between the scheduled reporting date and the issuance of the *Lubus* arrest warrant. By contrast, the record in this case contains evidence of ten failures to report as well as extensive investigative action by the supervising officer.

In *Lubus,* the Supreme Court analyzed "escape" in its classic sense as a scenario in which a lawfully incarcerated person "breaks out" of his confinement behind steel bars and concrete walls. Id., 407–408. One envisions fleeing prisoners wading through the swamps of Devil's Island, pursued by baying dogs while sirens wail in the distance. The *Lubus* court recognized, however, that in an attempt to accommodate the needs of chang-

ing rehabilitation practices and prison overcrowding, the legislature had redefined escape to include various types of misconduct that are not the stereotype breaching of prison walls. See General Statutes § 53a-169 (a) (4) (failure of person to return from an authorized furlough constitutes escape); General Statutes § 53a-169 (a) (5) (failure of person to return from work or education release constitutes escape).

The critical factor in *Lubus* was the nexus between custody and the conduct alleged to constitute the escape. The *Lubus* court enunciated that "[r]ead in context, § 53a-169 (a) (2) simply identifies another environment—a community residence—from which an unauthorized departure, or to which a failure to return, is possible and made culpable. The subsection does not, in this one instance, impose criminal sanctions for an 'escape' that has no demonstrated custodial nexus." Id., 409.

The present case presents the issue the *Lubus* court did not reach: whether repeated failures to report might allow an inference of custodial irregularity sufficient to constitute escape.[6] Here, the defendant repeatedly failed to report and intentionally concealed himself from his parole officer's persistent attempts to establish contact. The defendant intentionally evaded the constraints imposed on him. He did not deny this at trial, but rather offered the excuse that he feared reincarceration because of his drug abuse and therefore hid from his parole officer, although claiming never to have ceased residing in his mother's home. Thus, under *Lubus*, the defendant's "repeated failures to report as scheduled . . . reasonably support an inference of present or

---

[6] The *Lubus* court stated: "We need not decide today whether, at some juncture, repeated failures to report as scheduled would reasonably support an inference of present or imminent custodial irregularity and thus evidence a violation of [General Statutes] § 53a-169 (a) (2)." *State* v. *Lubus,* supra, 216 Conn. 409.

imminent custodial irregularity and thus evidence a violation of § 53a-169 (a) (2)." Id.

It is conceivable that a single failure to report could result from mere oversight or neglect. When, however, as in this case, a defendant completely removes himself from the constraints of his custody, a jury may infer that he has escaped. Accordingly, we conclude that the jury was properly instructed.

The defendant's second claim relies on the *Lubus* court's holding that the commissioner of correction exceeded his authority by defining escape to include a simple failure to report where the legislature itself had not criminalized such conduct. Id., 410. Because our conclusion that *repeated* failures to report as scheduled to an assigned community residence constitutes "escape" under General Statutes § 53a-169 (a) (2), the defendant's claim must fail.

The judgment is affirmed.

In this opinion the other judges concurred.